STATE OF NEBRASKA, APPELLEE, V. DAVID LEE BREWER, APPELLANT.

212 N. W. 2d 90

Filed November 9, 1973. No. 38763.

Frank B. Morrison, Sr., Stanley A. Krieger, and David Lee Brewer, for appellant.

Clarence A. H. Meyer, Attorney General, and Harold S. Salter, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

The defendant, Brewer, was charged in count I of an information with possessing a firearm with a barrel less than 12 inches in length after having been convicted of a felony. § 28-1011.15, R. S. Supp., 1972. In count II of the information he was charged with conviction of previous felonies which, if proved, would subject him to punishment as a habitual criminal. Following a verdict of guilty on count I which was rendered on August 16, 1972, on August 31, 1972, the defendant was sentenced by the court to a term of 20 months to 5 years in the Nebraska Penal and Correctional Complex. This sentence was imposed without a representative of the prosecutor's office being present. Later on the same day another hearing was held at which the prosecuting officer was represented and the State informed the court that it intended to prove the convictions necessary to punish Brewer as a habitual criminal. The court then purported to set aside the sentence imposed earlier that same day. On September 8, 1972, a hearing was held, proof was received on the prior felony convictions, and the court determined that

the defendant had twice before been convicted of felonies, had been sentenced thereon, and was a habitual criminal. The court then imposed a sentence of 10 to 15 years.

Two issues are raised on this appeal. In a brief filed by counsel the setting aside of the first sentence and the resentencing as a habitual criminal is attacked. In a brief filed by Brewer pro se it is contended that the court erred in receiving into evidence a certain 357 magnum Colt revolver and certain other items because they were the fruit of an illegal arrest and an unlawful search, and the trial court therefore erred in denying the defendant's motion to suppress.

We treat the second issue first because, if the error assigned in connection therewith is well taken, the entire conviction must be set aside.

The evidence as adduced at the suppression hearing and at trial, insofar as it pertains to the admission of the physical evidence which was sought to be suppressed, was substantially as follows: On the evening of April 8, 1972, at about the hour of 7 or 8 o'clock p.m., Sergeant Pfeffer of the Omaha police department received from an identified informant a telephone call advising him that the informant had information about a robbery that might be committed that evening. Pfeffer had known the informant for 6 to 8 months and had given him both his office and home telephone numbers for the purpose of relaying information. The sergeant had previously received from the informant information which required no action but which was accurate because the police already had the information as the result of their own investigations. Pfeffer considered the informant reliable.

Pfeffer was off duty at the time the phone call was received on April 8th and made arrangements for the informant to meet Sergeant Swanson of the intelligence division in the neighborhood where the informant claimed a robbery was to take place. Pursuant to this arrangement Swanson and the informant met near a Target

Store and talked for 15 or 20 minutes. There Swanson was given certain details of the planned robbery, including the location, the time, 9:30 p.m., names of three putative participants, viz., David Brewer, Warren Dittrich, and a man named Powell, and some information concerning a possible fourth participant, an alleged escaped convict. The information included the fact that two of the named participants were black and one, Dittrich, was an Indian or Caucasian. It also included description of two motor vehicles which might be used, a blue Oldsmobile and a bronze Buick, both bearing Nebraska plates. A general description of the weapons to be used was also given. These were described as being a shotgun and two handguns. This information was based upon the personal observation of the informant who had been asked to participate in the proposed crime by creating a diversion at another location. The original plan for this diversion included a discharge of a firearm by the informant with a weapon to be furnished by the informant's cohorts. Two of the named parties were neighbors of the informant and the third, Powell, was an acquaintance. The informant came to his meeting with Sergeant Swanson in a white Cadillac which was the property of Warren Dittrich, one of the alleged participants. Swanson recognized the Cadillac as belonging to Dittrich.

It is not clear from the testimony just how much of this information was given to Pfeffer in the earlier conversation with the informant, but the informant testified with reference to his conversation with Pfeffer: ". . . I informed him of what they wanted me to do, and asked him what should I do, you know, and he said, 'You go on down there at nine o'clock,' and he would have someone down there waiting for me." Neither is it clear that all the above details were given to Swanson by the informant, but it is clear that the more significant information was included. Swanson testified that he gave all the information he received to Officer

Gutchewsky who later made the arrest and supervised the search.

While Swanson and the informant were engaged in the conversation standing outside Swanson's unmarked car, the informant called to Swanson's attention an automobile which passed by, stating that it was one of the autos which was being used and that the planners were in it. Swanson saw enough of the automobile to recognize it as a blue Oldsmobile and thus fitting the description given earlier, but could not see the occupants well enough to identify them.

The informant then left the meeting with Swanson to keep a rendezvous with his associates. Swanson was informed that he was doing this. When he met them they quizzed him concerning his meeting with Swanson which they apparently observed. The informant made excuses. They told him to go back home. But, according to the informant's story at trial, they immediately followed him, stopped him, told him to go back and break a window with rocks in the Target Store, and cause a big commotion and get the police down there. The informant then went back to Swanson and advised him of what he had been told to do. Swanson at least acquiesced in the informant's carrying out his assignment or directed him to go do it. This item is in dispute.

In the meantime, the liquor lounge which was to be the target of the robbery was staked out by the police officers. No robbery took place at the time designated or at any time the evening in question.

At about 9:30, Sergeant Swanson communicated to Officer Gutchewsky and his partner, members of a strike force, the information which he had obtained. Officer Gutchewsky and his partner, apparently pursuant to instructions, established a stake out near the Warren Dittrich residence. These two officers were assisted by two other officers in the car nearby. This was at about 10 o'clock p.m. At about 10:30 p.m., a bronze Buick automobile driven by the defendant drove by and the

defendant sounded the horn and waved to the officers. The description of the car met that which the officers had been given. They stopped the car without difficulty. The defendant was asked to get out, which he did. When he was asked his name, he stated that it was Clarence Brewer. When asked for identification, he stated he had none. When asked about his business in the neighborhood, his answers were evasive and equivocal. Gutchewsky and his companion conferred. Gutchewsky said to his companion that because of past contacts he believed he recognized the defendant as David Brewer, one of the persons named by the informant. The officers then placed the defendant under arrest for giving false information to a police officer. See § 28-744, R. S. Supp., 1972.

At this point as the officers were preparing to make what they termed an inventory search of the car they received a radio call from another surveillance car stating that the blue Oldsmobile was coming down the street. They signaled with their flashlights to stop it. It continued past them. Gutchewsky followed on foot while his companion kept the defendant in custody. The other police car, which was following, placed its spotlight on the Oldsmobile and it stopped about ½ block beyond the Gutchewsky car. Dittrich and Powell were in that car. It was searched by other officers and a sawed-off shotgun and a handgun were found and those two were placed under arrest. Gutchewsky and his partner knew of this and realized one weapon still had not been found. The informant testified at trial that he had seen the 357 magnum in the waistband of Brewer at an earlier time. Whether this specific information had been relayed to the officers is not clear. However, Sergeant Swanson testified at the suppression hearing that the informant told him he had personally seen the weapons.

Other police cars were called to the scene. Gutchewsky and his partner returned to the Brewer car. At some

point Gutchewsky verified by a radio check that the car was registered to Clarence Brewer. Gutchewsky asked Officer Kelly to search the Buick. Kelly found the 357 magnum with one shell in the cylinder and five cartridges in a handkerchief. All these items were on top of the glove compartment underneath the dashboard of the automobile. The items were not secured in that position in any way. No search warrant had been obtained.

The questions to be answered are: (1) Was the stop for interrogation lawful? (2) Was there probable cause for arrest? (3) Was the search valid? We answer all three questions in the affirmative.

The stop of Brewer for interrogation was, in our judgment, justified under the standards announced by the Supreme Court of the United States in Adams v. Williams, 407 U. S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612; and under the provisions of section 29-829, R. S. Supp., 1972. In Adams v. Williams, *supra*, the court said: ". . . we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." The court there also said: "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more

information, may be most reasonable in light of the facts known to the officer at the time." It cited Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889. A police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest. Adams v. Williams, *supra*. Section 29-829, R. S. Supp., 1972, says in part as follows: "A peace officer may stop any person in a public place whom he reasonably suspects of committing, who has committed, or who is about to commit a crime and may demand of him his name, address and an explanation of his actions."

In this case, the arresting officers had, based upon information relayed to them by their superiors and which we have earlier set forth in this opinion, reasonable grounds to stop and interrogate the driver of the bronze Buick. When they did so and Brewer gave a false identity, stated he had no identification on him, and his explanation of his business was evasive and equivocal, further action was required. The information which they had been furnished earlier by Swanson had become even more pertinent and relevant. At this point, wholly apart from the matter of the false identity, the officers had probable cause to believe that Brewer might have concealed on his person or in the car which was under his immediate control one of the weapons which had been described to them. Thus they then had reasonable grounds to believe that: (1) Brewer had probably conspired to commit a felony; (2) he had a concealed weapon on his person or in the car under his immediate control; and they knew (3) he had given a false identity for the probable purpose of impeding their investigation. This last item was also a crime. See § 28-744, R. S. Supp., 1972.

In Adams v. Williams, *supra*, the court said: "Probable cause does not require the same type of specific evidence of each element of the offense as would be

needed to support a conviction," citing Draper v. United States, 358 U. S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327.

We find that when defendant was placed under arrest, probable cause existed within the meaning of the foregoing rules.

We find that the search of the automobile was justified on two grounds: (1) A search incident to and contemporaneous with the arrest, Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777; Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790; Brinegar v. United States, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879; Chimel v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685; and (2) probable cause to search the automobile, Carroll v. United States, *supra;* Chambers v. Maroney, 399 U. S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419.

Here there was an immediate need to search the automobile to prevent the possible loss of evidence of crime. This needed to be done while the automobile was still available to the officers. The fact that the automobile was registered to Clarence Brewer, who it developed was David Brewer's blood nephew and adopted brother, made this need more urgent as Clarence could at any time have appeared and claimed his car. In Carroll v. United States, *supra,* the court for the first time justified the search of an automobile without a warrant where the search was made on probable cause and upon a belief reasonably arising out of the circumstances known to the officer that the vehicle contained evidence of crime. The principles of that case are applicable here. See, also, Brinegar v. United States, *supra,* where it was said that probable cause exists where the facts and circumstances, within the officers' knowledge and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a belief by a man of reasonable caution that a crime is being committed.

The automobile at the time of the defendant's arrest

was an area within his immediate control within the meaning of Chimel v. California, *supra*. As long as the defendant was near the automobile the possibility existed that he might obtain therefrom a weapon, if one were there concealed, as turned out to be the fact. This constituted under the circumstances of this case a justification of the search incident to the arrest. Further search was directed to the obtaining of evidence related to one of the reasons for which the defendant had been arrested.

The justification for search without warrant grows out of the inherent necessities of the situation at the time of the arrest. Chimel v. California, *supra*, citing Trupiano v. United States, 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663. See, also, Chambers v. Maroney, *supra*, where the Supreme Court of the United States upheld the warrantless search of an automobile upon probable cause even after its removal from the scene of the arrest to the police station. Cf. Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564. We deem the fact that the officers sought to justify the search as an inventory search alone is immaterial. An inventory search would not normally reach the area where the gun was found.

We now examine the matter of the vacation of the original sentence and the imposition of the 10 to 15-year sentence. The record clearly discloses that immediately after the 20-month to 5-year sentence was imposed the court overruled a motion for a new trial. There can be no doubt that sentence was imposed and that the proceeding which took place at 9:30 a.m., on August 31, 1972, was not merely an announcement of a possible sentence to be imposed in the future. Neither is this a case where there was some ambiguity in the sentence or inadvertent misstatement in pronouncing it.

It is the majority rule long followed in this state that when a valid sentence has been put into execution the trial court cannot modify, amend, or revise it in any

way, either during or after the term or session of court at which the sentence was imposed. Any attempt to do so is of no effect and the original sentence remains in force. In re Jones, 35 Neb. 499, 53 N. W. 468; Hickman v. Fenton, 120 Neb. 66, 231 N. W. 510, 70 A. L. R. 819; Myers v. Fenton, 121 Neb. 56, 236 N. W. 143; Moore v. State, 125 Neb. 565, 251 N. W. 117; State v. Keyser, *ante* p. 445, 209 N. W. 2d 187; State v. Carpenter, 186 Neb. 605, 185 N. W. 2d 663; Housand v. Sigler, 186 Neb. 414, 183 N. W. 2d 493; State v. Huffman, 186 Neb. 809, 186 N. W. 2d 715; State v. Smith, *ante* p. 623, 211 N. W. 2d 415.

Section 29-2221, R. S. Supp., 1972, provides the circumstances and the procedure under which an individual may be punished as a habitual criminal. Procedurally the effect of the statute is to provide for a bifurcated trial. The statute says in part: "If the accused is convicted of a felony and before sentence is imposed, a hearing shall be had before the court alone as to whether such person has been previously convicted of prior felonies. The court shall fix a time for the hearing and notice thereof shall be given to the accused at least three days prior thereto. At the hearing, if the court shall find from the evidence submitted that the accused has been convicted two or more times of felonies and sentences imposed therefor by the courts of this or any other state, or by the United States, the court shall sentence such person so convicted as an habitual criminal."

As this court has frequently noted, the count of an information charging facts making the defendant punishable as a habitual criminal does not constitute a separate offense. Only one sentence may be imposed. State v. Huffman, *supra;* State v. Tyndall, 187 Neb. 48, 187 N. W. 2d 298.

In this case the sentence first imposed was a valid one for the crime of which the defendant was convicted.

The trial court under the circumstances shown by the

record was without power to vacate the sentence it had imposed on August 31, 1972. Accordingly we need not examine or rule on the defendant's contention that he has been twice placed in jeopardy.

The sentence of 10 to 15 years is set aside and the sentence of 20 months to 5 years is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.